CC-2000-598                                                    1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Corporación de Puerto Rico para la Difusión Pública<br>    Peticionario<br><br>              v.<br><br>Unión General de Trabajadores<br>    Recurrida<br><br>Negociado de Conciliación y Arbitraje<br>    Agencia Administrativa | Certiorari<br><br>2002 TSPR 51<br><br>156 DPR ____ |

Número del Caso: CC-2000-598


Fecha: 18/abril/2002


Tribunal de Circuito de Apelaciones:
                        Circuito Regional I


Juez Ponente:
                        Hon. German J. Brau Ramírez


Abogada de la Parte Peticionaria:
                        Lcda. Marcelle D. Martell Jovet


Abogados de la Parte Recurida:
                        Lcdo. Andrés Montañez Coss
                        Lcdo. Edwin Rivera Cintrón



Materia: Revisión Judicial de Laudo de Arbitraje




        Este documento constituye un documento oficial del Tribunal Supremo que está
        sujeto a los cambios y correcciones del proceso de compilación y publicación
        oficial de las decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Corporación de Puerto Rico
para la Difusión Pública

     Peticionario

        v.

Unión General de Trabajadores
                                        Certiorari

     Recurrida                CC-2000-598

Negociado de Conciliación y
Arbitraje

    Agencia Administrativa

SENTENCIA

San Juan, Puerto Rico, a 18 de abril de 2002.

**Nos corresponde resolver si la violación alegada en una querella radicada por la Unión General de Trabajadores en contra de la Corporación de Puerto Rico para la Difusión Pública constituía un agravio de naturaleza continua y, por ende, era arbitrable ante el Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos.**

**I**

**La Corporación de Puerto Rico para la Difusión Pública, en adelante la Corporación, y la Unión General de Trabajadores, en adelante la U.G.T., suscribieron un Convenio Colectivo el 8 de**

diciembre de 1994, con vigencia de cuatro (4) años.[1]  Mediante el aludido Convenio, la Corporación reconocía que la U.G.T. era la representante exclusiva de los empleados comprendidos en las unidades apropiadas definidas en el mismo, a los fines de negociar sus salarios, las horas de trabajo, sus beneficios marginales, los términos y condiciones de trabajo y el cumplimiento de sus términos.[2]

El Artículo VIII del Convenio establecía el procedimiento a seguirse para el trámite de las quejas y los agravios, así como para someterse al proceso de arbitraje. Dicho artículo disponía que todo empleado que se considerara perjudicado por alguna acción de la Corporación, debía presentar su queja ante su supervisor inmediato, por sí mismo o a través del delegado de la U.G.T., dentro del término de siete (7) días laborables desde la ocurrencia de los hechos que dieron margen al agravio.[3] El supervisor inmediato tendría, a su vez, siete (7) días laborables para dar su contestación a la queja.[4] En caso de que el supervisor no contestara la queja o si habiéndola contestado, a juicio del empleado o la U.G.T., esta contestación no hubiese sido satisfactoria, cualquiera de las partes antes mencionadas radicaría por escrito su agravio ante el Director de Recursos Humanos de la Corporación, dentro de un término de diez (10) días laborables.[5] El Director de Recursos Humanos debía dar su contestación dentro de diez (10) días laborables.[6] De no resolverse satisfactoriamente la controversia en las etapas anteriores, las partes individual o colectivamente procederían a radicar por escrito una solicitud para someter la querella al procedimiento de arbitraje, ante el Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos.[7]

Cabe señalar, que la Sección 7 del Artículo VIII del Convenio disponía expresamente que todos los términos establecidos en dicho artículo serían "improrrogables y jurisdiccionales para todas las partes", excepto que la Corporación y la U.G.T decidieran por acuerdo suscrito por ambas extender cualquier término.[8]

---

[1] Apéndice I de la petición de <u>Certiorari</u>, pág. 3; Apéndice II, Íd., pág. 109.

[2] Apéndice II de la petición de <u>Certiorari</u>, pág. 52.  El Artículo V del Convenio Colectivo establecía quiénes eran los empleados cubiertos por el mismo.  Éstos eran los empleados de Producción, Mantenimiento y Oficina, así como el personal Profesional y Técnico de la Corporación.

[3] Íd., págs. 55-56.

[4] Íd., pág. 56.
[5] Íd.

[6] Íd.

[7] Íd.

[8] Íd., pág. 57.

La Corporación concedió un aumento de sueldo por mérito a ciertos empleados unionados, a ser efectivo el 1 de septiembre de 1996.[9] Los empleados no beneficiados por dicho aumento de sueldo se enteraron de la concesión salarial el 16 de septiembre de 1996.[10] El señor Alberto Garcias fue uno de los empleados no beneficiados por el aumento de sueldo. El 20 de septiembre de 1996, éste último envió una carta a su supervisor inmediato quejándose de su exclusión en la concesión de aumento de sueldo.[11] El 1 de octubre de 1996, la Corporación envió una carta a la U.G.T. notificándole oficialmente los aumentos concedidos.[12] Esta carta fue recibida por la U.G.T. el 7 de octubre de 1996.[13] La U.G.T., en representación de sus unionados, inició el 15 de noviembre de 1996 el procedimiento formal de quejas y agravios ante el Gerente de Producción de la Corporación. Mediante carta a esos efectos, cuestionó la actuación de la Corporación de conceder aumentos de salarios por mérito a ciertos empleados del Departamento de Servicios Creativos y no a otros empleados de la misma área de trabajo.[14] El 2 de diciembre de 1996 la Corporación replicó y adujo que la querella presentada por la U.G.T. no era arbitrable, toda vez que la misma fue radicada fuera del término de siete (7) días que establecía el mencionado Artículo VIII del Convenio Colectivo para iniciar el procedimiento de quejas y agravios.[15] El 3 de diciembre de 1996 la U.G.T. acudió mediante carta al Director de Recursos Humanos de la Corporación, conforme al trámite contemplado en el Convenio Colectivo.[16] La Corporación se reafirmó en su planteamiento de que la querella no era arbitrable, por haber sido presentada tardíamente.[17] La U.G.T. le solicitó al Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos someter tal controversia al proceso de arbitraje. Las partes acordaron que un árbitro de dicho organismo determinara si la querella radicada era arbitrable procesalmente.[18]

---

[9] Apéndice I de la petición de Certiorari, pág. 5.

[10] Apéndice II, Íd., pág. 129.

[11] Íd., pág. 118. El señor Alberto Garcías realizó su reclamación dentro del término de siete (7) días dispuesto en el Convenio Colectivo para así hacerlo.

[12] Íd., pág. 119.

[13] Íd., pág. 130.

[14] Íd., pág. 121. En la carta de la U.G.T. se establecía que los querellantes eran los técnicos de estudio de televisión: José I. Corraliza, Alberto Garcías, Luis Rolón y otros.

[15] Íd., págs. 122-123.

[16] Íd., pág. 124.

[17] Íd., págs. 125-126.

[18] Íd., pág. 129.

El 22 de junio de 1999, la árbitro del Negociado de Conciliación y Arbitraje emitió un laudo, concluyendo que el señor Alberto Garcías había sido el único reclamante que había radicado su reclamación durante el período de tiempo dispuesto en el Convenio Colectivo.[19] Concluyó, además, que los demás querellantes presentaron su reclamación fuera del período de siete (7) días prescrito en el Convenio Colectivo. No obstante, determinó que la querella de la U.G.T. era arbitrable. Fundamentó su determinación en la naturaleza continua del agravio.[20] Inconforme con esta determinación, la Corporación acudió al Tribunal de Primera Instancia, Sala Superior de San Juan, alegando que la querella instada por la U.G.T. fue presentada fuera del término fatal provisto en el Convenio Colectivo.[21] El 2 de noviembre de 1999, el Tribunal de Primera Instancia revocó el laudo de arbitraje emitido.[22] Determinó que la querella se presentó fuera del término fatal y jurisdiccional de siete (7) días establecido en la Sección 2 del Artículo VIII del Convenio Colectivo, por lo que la árbitro carecía de jurisdicción para entender en la controversia. Concluyó, asimismo, que el aumento de sueldo concedido constituía un solo acto, no varios actos continuados. La resolución emitida por el Tribunal de Primera Instancia no contiene mención alguna referente a la reclamación presentada personalmente por el señor Alberto Garcías el 20 de septiembre de 1996.[23]

La U.G.T. acudió, mediante recurso de _Certiorari_, ante el Tribunal de Circuito de Apelaciones. Dicho foro apelativo expidió el auto solicitado y dictó sentencia el 24 de mayo del 2000, revocando la resolución recurrida.[24] Concluyó que la controversia era arbitrable, porque se trataba de un agravio continuo.[25] A tenor con lo anterior, determinó que la U.G.T. podía utilizar el procedimiento de arbitraje para reclamar el pago de los

_____

[19] Íd., pág. 131.

[20] Íd., pág. 132.

[21] Íd., págs. 133-148.

[22] Íd., págs. 169-174.

[23] La reclamación realizada personalmente por el señor Garcias fue presentada oportunamente. Los planteamientos de la Corporación iban dirigidos a la reclamación realizada por la U.G.T., en representación de los empleados, el 15 de noviembre de 1996.

[24] Apéndice I de la petición de _Certiorari_, págs. 1-16. El Tribunal de Circuito de Apelaciones expresó lo siguiente:

> A pesar de que prácticamente ninguno de los querellantes, con excepción del señor Alberto Garcias, había presentado su querella dentro del término de siete (7) días laborables establecido en el Artículo VIII del convenio, el árbitro determinó que la querella de la Unión sí era arbitrable procesalmente. Admitió el planteamiento de la Unión de que el agravio en cuestión era de naturaleza continua, ya que "por ser una reclamación de salarios, cada día de pago en que no se haya concedido el aumento, surge nuevamente la causa de acción".

[25] Íd., pág. 15.

salarios devengados a partir del 15 de noviembre de 1996, fecha en que presentó formalmente la querella de sus unionados.[26]

Inconforme, la Corporación acudió ante nos el 5 de julio del 2000, mediante recurso de _Certiorari_, señalando la comisión por el Tribunal de Circuito de Apelaciones de los errores siguientes:

> 1. ERRO EL HONORABLE TRIBUNAL DE CIRCUITO DE APELACIONES AL DETERMINAR QUE LA QUERELLA PRESENTADA POR LA UNIÓN ERA PROCESALMENTE ARBITRABLE, TODA VEZ QUE LA ARBITRO CARECIA DE JURISDICCIÓN PARA ENTENDER EN LA MISMA.

> 2. ERRO EL HONORABLE TRIBUNAL DE CIRCUITO DE APELACIONES AL DETERMINAR LA EXISTENCIA DE UNA VIOLACIÓN CONTINUA EN LO QUE RESPECTA A LOS AUMENTOS POR MERITO A PERSONAL UNIONADO, AUN CUANDO NO EXISTE PRECEDENTE ALGUNO PARA ELLO EN NUESTRA JURISDICCIÓN, IGNORANDO ASI LOS TERMINOS CLAROS DE NATURALEZA JURISDICCIONAL E IMPRORROGABLE PROVISTOS POR EL CONVENIO COLECTIVO VIGENTE ENTRE LAS PARTES.

Con la comparecencia de las partes, estamos en posición de resolver.

## II

Los aumentos por mérito concedidos no estaban contemplados en el Convenio Colectivo aprobado, vigente y aplicable a la controversia de autos. La decisión patronal de concederlos no constituye una violación de carácter continuo al Convenio Colectivo, porque dichos aumentos no estaban contemplados en el mismo. No estando contemplados los referidos aumentos por mérito en el Convenio Colectivo, su concesión era prerrogativa discrecional de la gerencia. La decisión de concederlos constituyó un solo acto o acción única, que tuvo la consecuencia de procurar mayores ingresos a ciertos empleados.[27] Si la U.G.T. quería cuestionar los aumentos concedidos, debía cumplir con los pasos y términos específicos contemplados en el proceso de ventilación de quejas, agravios y arbitraje para el encausamiento de las querellas. Esta última no cumplió con presentar la querella dentro del término de siete (7) días laborables para iniciar el primer paso del procedimiento desde la ocurrencia del hecho que dio margen al agravio. Por lo tanto, la querella presentada por la U.G.T. no era arbitrable procesalmente.

Concluimos que el señor Alberto Garcias cumplió con el paso inicial del procedimiento de quejas, agravios y arbitraje del Convenio Colectivo. Su queja fue presentada oportunamente y, por ende, es arbitrable procesalmente.

Por los fundamentos antes expuestos, se revoca la sentencia recurrida, emitida por el Tribunal de Circuito de Apelaciones. Se mantiene en todo su vigor y efecto lo dictaminado por el árbitro en el laudo de arbitraje, a los efectos de que el señor Alberto

---

[26] Íd., pág. 16.

[27] _J.R.T. v. A.E.E._, 113 D.P.R. 564 (1982).

Garcias presentó su reclamación oportunamente, a tenor con lo dispuesto en el Convenio Colectivo.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo.  El Juez Asociado señor Rivera Pérez emitió Opinión de Conformidad, a la que se unió el Juez Asociado señor Corrada del Río.  El Juez Presidente señor Andréu García y el Juez Asociado señor Rebollo López concurren sin opinión escrita.  La Jueza Asociada señora Naveira de Rodón y el Juez Asociado señor Hernández Denton disienten sin opinión escrita.  El Juez Asociado señor Fuster Berlingeri disiente con opinión escrita.  Todos los Jueces intervienen en el presente caso, por Regla de Necesidad.


Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Corporación de Puerto Rico
para la Difusión Pública

       Peticionario

         v.

Unión General de Trabajadores

       Recurrida

Negociado de Conciliación y
Arbitraje

    Agencia Administrativa

                           Certiorari

                           CC-2000-598


**Opinión de Conformidad emitida por el Juez Asociado señor Rivera Pérez, a la cual se une el Juez Asociado señor Corrada del Río.**


San Juan, Puerto Rico, a 18 de abril de 2002.

**La negociación colectiva en el ámbito laboral pretende, entre otras cosas, fomentar la paz industrial a través de medios adecuados que ayuden a resolver de forma pacífica las controversias obrero patronales.[28] Por dicha razón, los convenios colectivos están revestidos de un alto interés público.[29] Este Tribunal ha sido enfático en que todo convenio colectivo constituye un contrato entre las partes y, en consecuencia, debe**

---

[28] Véase el Artículo 1 de la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945, 29 L.P.R.A. sec. 62.

[29] Íd.

cumplirse con estricta rigurosidad.[30] De contener el convenio colectivo disposiciones para el procesamiento de quejas y agravios, y para su eventual ventilación a través del proceso de arbitraje, éstas deben ser cumplidas estrictamente.[31] Cuando la observancia rigurosa del procedimiento contenido en el convenio colectivo para la ventilación de querellas y agravios represente un acto fútil, un gesto vacío, un paso irreal o imposible no será necesario cumplir con el mismo.[32]

Por otra parte, en Puerto Rico existe una vigorosa política pública a favor del arbitraje obrero patronal.[33] Hemos reiterado que el arbitraje es el medio más apropiado para la resolución de controversias que emanan de la relación laboral, pues es un medio menos técnico, más flexible y menos oneroso.[34] Por ello, ante un convenio voluntario de arbitraje la abstención judicial es prudencial.[35] Sin embargo, la intervención judicial no está vedada, pero sí autolimitada. La revisión de los laudos de arbitraje se circunscribe a la determinación de la existencia de fraude, conducta impropia, falta del debido proceso de ley, violación a la política pública, falta de jurisdicción o que el laudo no resuelve todos los asuntos en controversia.[36] No obstante, si el convenio colectivo dispone que los asuntos sometidos al arbitraje serán resueltos conforme a derecho, la facultad del tribunal se extiende para revisar, además, los méritos jurídicos

---

[30] **Vélez v. Serv. Legales de P.R., Inc.**, 144 D.P.R. 673 (1998); **Martínez Rodríguez v. A.E.E.**, 133 D.P.R. 986 (1993); **J.R.T. v. Junta Adm. Muelle Mun. de Ponce**, 122 D.P.R. 318 (1988); **San Juan Mercantile Corp. v. J.R.T.**, 104 D.P.R. 86 (1975); **Pérez v. Autoridad Fuentes Fluviales**, 87 D.P.R. 118 (1963); **Luce & Co. v. Junta Rel. Trabajo**, 86 D.P.R. 425 (1962).

[31] Vélez v. Serv. Legales de P.R., Inc., supra; Martínez Rodríguez v. A.E.E., supra; Hermandad Unión de Empleados v. F.S.E., 112 D.P.R. 51 (1982); J.R.T. v. A.F.F., 111 D.P.R. 837 (1982); San Juan Mercantile Corp. v. J.R.T., supra; Beaunit of Puerto Rico v. J.R.T., 93 D.P.R. 509 (1966).

[32] Hermandad Unión de Empleados v. F.S.E., supra.

[33] Vélez v. Serv. Legales de P.R., Inc., supra; U.C.P.R. v. Triangle Engineering Corp., 136 D.P.R. 133 (1994); World Films, Inc. v. Paramount Pict. Corp., 125 D.P.R. 352 (1990).

[34] Martínez Rodríguez v. A.E.E., supra; U.I.L. de Ponce v. Dest. Serrallés, Inc., 116 D.P.R. 348 (1985); S.I.U. de P.R. v. Otis Elevator Co., 105 D.P.R. 832 (1977); Pérez v. Autoridad Fuentes Fluviales, supra.

[35] U.C.P.R. v. Triangle Engineering Corp., supra; J.R.T. v. Hato Rey Psychiatric Hosp., 119 D.P.R. 62 (1987).

[36] Condado Plaza v. Asoc. Emp. Casinos P.R., res. el 7 de octubre de 1999, 99 TSPR 148, 149 D.P.R. ___ (1999), 99 J.T.S. 153; J.R.T. v. Hato Rey Psychiatric Hosp., supra; U.I.L. de Ponce v. Dest. Serrallés, Inc., supra.

del laudo.[37] El condicionar un laudo a que sea conforme a derecho significa, en adición, que el árbitro no podrá ignorar las normas de derecho sustantivo en el campo del derecho laboral.[38] Se reputarán persuasivas las decisiones del Tribunal de Primera Instancia, de las agencias administrativas, los laudos y los escritos de los árbitros.[39] La revisión judicial de los laudos de arbitraje es análoga a la revisión judicial de las decisiones administrativas.[40]

La Sección 6 del Artículo VIII del Procedimiento de Quejas, Agravios y Arbitraje del Convenio Colectivo en controversia disponía que las decisiones del árbitro debían rendirse conforme a derecho, por lo que resulta procedente nuestra revisión de las cuestiones de derecho relativas a la arbitrabilidad procesal de las quejas presentadas.


II

La libertad de contratación y el proceso de negociación colectiva le confiere a las partes que componen la relación obrero patronal la facultad de establecer el sistema de procesamiento y adjudicación de las quejas y agravios que prevalecerá durante la vigencia del convenio colectivo.[41] Cuando las partes voluntariamente escogen el arbitraje como mecanismo de la dilucidación de las controversias que surgen a raíz del convenio colectivo, sustituyen el foro judicial por el foro de arbitraje.[42] La determinación de si el agravio se procesó dentro del término estipulado y de la manera convenida en el convenio colectivo, constituye un asunto medular a ser decidido por el árbitro, ya que éstos poseen gran "expertise" en dicho menester y, al igual que los tribunales, deben velar por su jurisdicción antes de entrar en los méritos de la querella.[43] Tanto en el arbitraje en la esfera federal como en el arbitraje a nivel local, es doctrina claramente establecida que el cumplimiento estricto con las disposiciones contempladas en los convenios colectivos para el procesamiento de querellas es

---

[37] U.C.P.R. v. Triangle Engineering Corp., supra; Sonic Knitting Industries v. I.L.G.W.U., 106 D.P.R. 557 (1977); Junta Relaciones del Trabajo v. N.Y. & P. R. S/S. Co., 69 D.P.R. 782 (1949).

[38] Condado Plaza v. Asoc. de Emp. Casinos P.R., supra; J.R.T. v. Hato Rey Psychiatric Hosp., supra; Sonic Knitting Industries v. I.L.G.W.U., supra.

[39] Íd.

[40] Rivera v. Dir. Adm. Trib., 144 D.P.R. 808 (1998); U.G.T. v. Challenger Caribbean Corp., 126 D.P.R. 22 (1990); U.I.L. de Ponce v. Dest. Serrallés, Inc., supra.

[41] D. Fernández Quiñones, El Arbitraje Obrero Patronal, 1ra ed., Colombia, Legis S.A., 2000, pág. 236.

[42] Condado Plaza v. Asoc. de Emp. Casinos P.R., supra; J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra.

fundamental.[44]  Generalmente el incumplimiento con los términos y el procedimiento

establecido en el convenio colectivo conlleva la desestimación de la querella, pues se

pretende que la tramitación de los agravios sea pronta y diligente.  A esos efectos,

el tratadista Owen Fairweather expresa lo siguiente:[45]

> When a grievance has not been filed within the time limits set forth in the
> collective bargaining agreement, the arbitrator generally will dismiss the
> claim as nonarbitrable unless the opposing party has waived this procedural
> defect.  Since the parties have limited the cases which they agree to arbitrate
> according to the terms of their agreement, the arbitrator has no authority to
> hear a claim presented too late, because it has not properly entered the
> procedure and hence has not reached the arbitration "step".  Arbitrators have
> supported the dismissal not only on the ground that the arbitrator must receive
> authority to hear the grievance claim from the agreement, but also on the ground
> that the establishment of a time limit reflects the parties' recognition that
> grievance matters should be heard promptly and not allowed to fester for long
> periods permitting evidence to be lost and recollections to be dimmed.  ...

Este proceder es afín con la política pública del Estado de fomentar la paz

laboral.[46]  El procesamiento rápido de los agravios ayuda, además, a lograr una

presentación más exacta y precisa del cuadro fáctico que dio margen a éste.  No obstante,

existen situaciones de hechos, muy particulares, que eluden la norma antes expresada.

Ejemplifican estas excepciones las circunstancias siguientes: que ambas partes hayan

incumplido con los términos estipulados en el convenio colectivo; que las partes hayan

acordado extender los términos establecidos en el convenio colectivo; que el patrono

no hubiera objetado, o hubiera objetado tardíamente, la tramitación de la querella; que

el agravio no hubiera sido conocido sino hasta una fecha posterior a su ocurrencia; que

la querella hubiera sido prematura si se hubiese presentado en los términos contemplados

en el convenio colectivo; que el patrono haya inducido por sus acciones a la radicación

tardía del agravio; y, por último, que el agravio alegado constituya una violación de

carácter continuo.[47]  La naturaleza de este último hace que el mismo surja o se renueve

día a día y, por tanto, se pueda presentar la queja en cualquier momento mientras la

---

[43] Elkouri & Elkouri, How Arbitration Works, 5th ed., Washington D.C., The Bureau of National Affairs, 1985, págs. 283, 305-307; D. Fernández Quiñones, op. cit., págs. 236 y 425.

[44] Rivera v. Coop. Ganaderos de Vieques, 110 D.P.R. 621 (1981); Sria. del Trabajo v. Hull Dobbs, 101 D.P.R. 286 (1973).

[45] O. Fairweather, Practice and Procedure in Labor Arbitration, 2nd ed., Washington D.C., The Bureau of National Affairs, 1983, pág. 101; F. Elkouri, pág. 274. Véase también D. Fernández Quiñones, op. cit, págs. 236, 426.

[46] Buena Vista Dairy, Inc. v. J.R.T., 94 D.P.R. 624 (1967).

[47] O. Fairweather, op. cit., págs. 103-105; Elkouri & Elkouri, op. cit., págs. 276-283; BNA Labor Relations Reporter, Labor Review Expediter, secs. 540: 306-307, (1988).

violación contractual continúe **y** se interponga en el período prescrito en el convenio.[48] **En el campo laboral los árbitros han utilizado dicha excepción para determinar que una** violación continua al convenio colectivo **da base a** un agravio continuo **procesable en el procedimiento establecido en el convenio colectivo. La doctrina de una violación continua al convenio colectivo que da base a una reclamación de carácter continuo fue acogida por este Tribunal en el caso <u>J.R.T. v. A.E.E.</u>[49]**

**La determinación de la existencia de una violación de carácter continuo no es tarea fácil y la aplicación del concepto en el ámbito laboral ha sido objeto de confusión y, en consecuencia, de decisiones divergentes.** [50] El factor determinante para el discernimiento de la existencia de una violación continua es el acto que causó la queja o el agravio y no el enfoque en sus efectos.[51] **Debido a ésto, el remedio a concederse en los casos en que se determine que existe una violación de carácter continuo se otorgará desde que la querella fue presentada y no desde que ocurrió el acto inicial que dio origen al agravio.**[52] **Conviene destacar, que un número considerable de árbitros en el campo laboral ha utilizado el enfoque conocido como el "paycheck-as-violation approach" para determinar la existencia de una violación de carácter continuo. Dicha óptica considera que cada cheque pagado al empleado por una cantidad menor de la que alegadamente es titular, producto de una decisión patronal, constituye una violación nueva y separada y, por lo tanto, es procesable por el mecanismo establecido para la ventilación de quejas**

---

[48] D. Fernández Quiñones, <u>op. cit.</u>, pág. 237. **Este Tribunal en <u>Galib Frangie v. El Vocero de P.R.</u>, 138 D.P.R. 560 (1995), citando a Herminio Brau del Toro, definió un daño de carácter continuo de la manera siguiente:**

*Daños continuados* son "aquéllos producidos por uno o más actos culposos o negligentes imputables al actor, coetáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas, duraderas sin interrupción, unidas entre sí, las cuales al ser conocidas hacen que también se conozca -por ser previsible- el carácter continuado e ininterrumpido de sus efectos, convirtiéndose en ese momento en un daño cierto compuesto por elementos de daño actual (aquel que ya ha acaecido) y de daño futuro previsible y por tanto cierto".

[49] 113 D.P.R. 564 (1982).

[50] R.I. Bloch, <u>Arbitration: Time Limits and Continuing Violations</u>, 96 MiChingan Law Review 2384 (1988).

[51] R.I. Bloch, <u>supra</u>, pág. 2389. Véase también <u>Unión General de Trabajadores v. Triple SSS</u>, 143 F. Supp. 2d 178 (2001); <u>El Mundo Broadcasting Corp. v. Unites Steelworkers of America</u>, 116 F.3d 7 (1997); <u>Delaware State College v. Ricks</u>, 449 US 250 (1980).

y agravios. La referida aplicación es, con frecuencia, objeto de un uso erróneo, debido a que dicha práctica no distingue entre cheques que constituyen por sí nuevos actos de violación y otros que sólo son la manifestación y el efecto de un acto previo que en sí constituyó la violación que dio paso al agravio.[53] La doctrina de violación de carácter continuo en el campo laboral se ha aplicado con más frecuencia a las reclamaciones por daños resultantes de la negativa patronal de remunerar a un empleado, según la clasificación establecida en el convenio colectivo para su puesto, y por la negativa patronal de otorgar aumentos por mérito a ciertos empleados cuando éstos están contemplados en dicho documento.[54]

Por otro lado, en el campo obrero patronal se ha reconocido que los aumentos por mérito son materia apropiada para ser establecida en los convenios colectivos.[55] No obstante, cuando un convenio colectivo no contiene cláusulas respecto a la concesión de aumentos por mérito o cuando el convenio colectivo sí contiene dichas cláusulas, pero no expresa quién hará la determinación inicial de la concesión de éstos, la determinación le corresponde y es prerrogativa discrecional de la gerencia.[56] En otras palabras, ausentes cláusulas contractuales en el convenio colectivo que contemplen la concesión de aumentos por mérito, la otorgación de éstos concierne únicamente a la gerencia y la misma sólo podrá ser impugnada exitosamente cuando haya sido injusta, arbitraria, discriminatoria o se haya basado en evidencia insuficiente o en una representación

---

[52] J.R.T. v. A.E.E., supra; O. Fairweather, op. cit., pág. 103.

[53] R.I. Bloch, supra, pág. 2389.

[54] O. Fairweather, op. cit, pág. 104; Elkouri & Elkouri, op. cit., págs. 785-788. Véase USS v. United Steelworkers of America Local 1219, 109 LA 434 (1997) (Bethel); Harding Galesburg Mkts., Inc. v. UFCW Local 951, 103 L.A. 1158 (1994) (Daniel); Titan Wheel Intl. v. International Assn. of Machinists & Aerospace Workers Local 2048, 97 LA 514 (1991) (Smith); Steel Warehouse Co., Inc., 45 LA 357 (1965) (Dolnick); Lycoming División, 43 LA 765 (1964) (Kornblum), para ejemplos de uso de la doctrina de violación de carácter continuo por pagos no correspondientes para la clasificación del puesto, y Taylor Winfield Corp., 45 LA (1965) (Kates), para un ejemplo de la doctrina aplicada a aumento por razón de mérito.

[55] Elkouri & Elkouri, op. cit., pág. 785; M. Hill, A.V. Sinicropi, Management Rights, Washington D.C., The Bureau of National Affairs, Inc., 1986, pág. 339.

[56] Elkouri & Elkouri, op. cit., págs. 785-788; M. Hill, A.V. Sinicropi, op. cit., págs. 339-341. Véase, además, Union Starch & Co., 15 LA 4 (1950) (Townsend); National Lock Co., 15 LA 180 (1950) (Luskins); International Harvester Co., 14 LA 77 (1950) (Seward); Wetter Numbering Machine Co., 14 LA 97 (1950) (Cahn); Supermatic Products Corp., 14 LA 139 (1950) (Bernstein); Bethlehem Steel Co., 11 LA 1199 (1948) (Simkin); Warren City Mfg. Co., 7 LA 202 (1947) (Abernethy).

errónea de los hechos.[57]  Respecto a ésto, el árbitro Feinberg expresó en <u>Bethlehem Steel</u>

<u>Co.</u>[58] lo siguiente:

> ... [M]erit is difficult to prove and the parties themselves, through daily observation of the employee, have usually gained greater knowledge of the employee's abilities and efficiency than the Umpire can ever have.  In the absence of detailed proof, a third party is generally not in a position to determine whether an employee has demonstrated increased efficiency or whether the quality of his work has improved.  It is recognized that that determination can best be made by the employee's supervisor, who is closest to the employee in these matters.
>
> ...

En el caso de autos hubo una sumisión expresa de las partes otorgándole al árbitro del Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos de Puerto Rico la autoridad para deliberar sobre el aspecto procesal de la querella en controversia.  Dicho árbitro entendió que la querella era arbitrable, debido a que ésta era una reclamación de salarios y, en consecuencia, constituía una violación de carácter continuo al convenio colectivo.  No compartimos tal óptica.  La acción patronal que da base a la querella en el caso de autos fue la concesión de ciertos aumentos por mérito por parte de la gerencia a algunos empleados de la unidad apropiada.  La árbitro y la U.G.T. pasan por alto que los aumentos por mérito concedidos no estaban contemplados en el Convenio Colectivo en controversia.[59]  La decisión patronal de concederlos no puede constituir una violación de carácter continuo al Convenio Colectivo, porque dichos aumentos no estaban contemplados en el mismo.  No estando contemplados los referidos aumentos por mérito en el Convenio Colectivo, su concesión era prerrogativa discrecional de la gerencia.  La decisión de concederlos constituyó un solo acto o acción única, que tuvo la consecuencia de procurar mayores ingresos a ciertos empleados.  Es decir, los pagos o cheques que recibieron los empleados beneficiados, como consecuencia de dicha acción patronal, fueron sólo el efecto de dicha decisión.  En consecuencia, si la U.G.T. quería cuestionar los aumentos concedidos debía cumplir con los pasos y términos específicos contemplados en el proceso de ventilación de quejas, agravios y arbitraje para el encauzamiento de las querellas.  La Sección 2 del Artículo VIII del mismo establecía, de manera específica, el término de siete (7) días laborables para iniciar el primer paso del procedimiento desde la ocurrencia del hecho que da margen al agravio. De la relación de hechos realizada por la árbitro surge que los empleados querellantes tuvieron conocimiento de los aumentos de sueldo concedidos desde el 16 de septiembre de 1996, y que la U.G.T. lo tuvo oficialmente y por escrito desde el 7 de octubre de 1996.[60]  No obstante, no fue hasta el 15 de noviembre de 1996 que la U.G.T. inició el

---

[57] Íd.

[58] 21 LA 614, 616 (1953) (Feinberg).

[59] Apéndice III de la petición de <u>Certiorari</u>, pág. 129.

[60] Íd., págs. 129-130.

primer paso del procedimiento de ventilación de agravios contemplado en el Convenio Colectivo.  Constituyendo los términos incluidos en el Artículo VIII del Convenio Colectivo unos "improrrogables y jurisdiccionales", y no surgiendo que las partes hayan suscrito acuerdo alguno para extenderlos, no podemos sino concluir que la U.G.T. incumplió con el primer paso del procedimiento allí establecido.

Concluimos, sin embargo, que el señor Alberto Garcías cumplió con el paso inicial del procedimiento de quejas, agravios y arbitraje del Convenio Colectivo.  El 20 de septiembre de 1996, el señor Garcías, mediante carta, le presentó a su supervisor inmediato su queja en relación con el aumento concedido a otros empleados de su unidad apropiada.[61]  Dicha carta fue presentada oportunamente dentro del término de siete (7) días estipulado por las partes en la Sección 2 del Artículo VII del Convenio Colectivo para el inicio de la ventilación de los agravios.[62]  Por consiguiente, su querella es arbitrable procesalmente.

Estimamos que los hechos del caso de autos son distintos a los que nos enfrentamos en J.R.T. v. A.E.E., supra.  Allí determinamos que una reclamación laboral que persigue un aumento de sueldo por años de servicio, derecho establecido en el convenio colectivo, no era tardía por tratarse de una reclamación de carácter continuo.  Concluimos que cada vez que un patrono paga el salario de un empleado, sin incluir el aumento por años de servicio a que éste tiene derecho de acuerdo a lo dispuesto en el convenio colectivo, surge una nueva causa de acción, procesable de conformidad a lo contemplado en dicho convenio.  En esa ocasión reafirmamos el laudo emitido por el árbitro del Negociado de Conciliación y Arbitraje, porque éste había llegado a la determinación de que la reclamación laboral era una de naturaleza continua interpretando, de manera conjunta, las cláusulas del convenio y el propósito que animaba el referido aumento.[63]  Es decir, pusimos en vigor el laudo, porque el aumento por años de servicio impugnado en dicho caso estaba contemplado en el convenio colectivo suscrito por la Autoridad de Energía Eléctrica de Puerto Rico y la Unión de Trabajadores de la Industria Eléctrica y Riego de Puerto Rico.

### III

Reiteramos que la doctrina del precedente no es de ordinario aplicable al campo del arbitraje obrero patronal.[64]  Sin embargo, un laudo emitido con anterioridad por un árbitro, en una disputa laboral entre el mismo patrono, la misma unión, respecto al mismo

---

[61] Íd., pág. 118.

[62] Íd., pág. 56.

[63] J.R.T. v. A.E.E., supra, pág. 568.

[64] D. Fernández Quiñones, op. cit., pág. 24; O. Fairweather, op. cit., pág. 570; Elkouri & Elkouri, op. cit., págs. 608-610.

asunto, interpretando la misma disposición del convenio colectivo, es considerada como de gran fuerza persuasiva para lograr dos propósitos: mantener la continuidad de la interpretación del convenio colectivo y mantener la estabilidad de la relación obrero patronal.[65]

Existe un laudo previo, emitido el 23 de octubre de 1997, que interpreta el Artículo VIII del Convenio Colectivo aquí en controversia.[66]  Dicho laudo fue emitido luego que la U.G.T. y la Corporación le sometieran a un árbitro del Negociado de Conciliación y Arbitraje la controversia, a los efectos de si una querella, en la cual se impugnaba la concesión de unos aumentos de sueldo a ciertos empleados de la Unidad Apropiada A, era arbitrable en su aspecto procesal.[67]  El árbitro determinó que la querella no era arbitrable procesalmente, por haber sido presentada tardíamente.  Concluyó que la U.G.T. inició el primer paso del procedimiento de quejas, agravios y arbitraje el 15 de noviembre de 1996, aún cuando tuvo conocimiento de la concesión de los aumentos desde el 7 de octubre de 1996.  Ambas fechas coinciden con el curso de los incidentes procesales en el caso de autos.

Concluimos que la U.G.T. debió darle cumplimiento fiel y estricto a las disposiciones contempladas en el Artículo VIII de Procedimientos de Quejas, Agravios y Arbitraje del Convenio Colectivo, y no lo hizo.


Efraín E. Rivera Pérez
Juez Asociado

---

[65] O. Fairweather, op. cit, págs. 573-578; Elkouri & Elkouri, op. cit., pág. 610; M. Hill, A.V. Sinicropi, op. cit., págs. 33-34.

[66] Apéndice III de la petición de Certiorari, págs. 175-181.

[67] La Unidad Apropiada A incluía a los empleados de producción, mantenimiento y oficina.  Tenemos ante nos, en esta ocasión, la querella de los empleados de la Unidad Apropiada B, que incluye a los empleados profesionales y técnicos.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Corporación de Puerto Rico
para la Difusión Pública
        Peticionario

                v.

Unión General de Trabajadores          CC-2000-598          Certiorari
        Recurrida

Negociado de Conciliación y
Arbitraje
        Agencia Administrativa

**Opinión Disidente emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI.**

San Juan, Puerto Rico, a 18 de abril de 2002.

En el caso de autos, una mayoría del Tribunal **revoca** un laudo de arbitraje sobre la **arbitrabilidad** de una controversia laboral. Llega a tal resultado, a pesar de que ello es **contrario** a lo resuelto claramente sobre el asunto en cuestión por este Tribunal en <u>J.R.T. v. A.E.E.,</u> 113 D.P.R. 564 (1982). **La mayoría no explica de modo alguno por qué no aplica aquí esa autoritativa decisión nuestra**. Para todos los efectos prácticos la mayoría **revoca** *sub silentium* esa pertinente opinión anterior nuestra, **sin justificarlo.**

Por otro lado, esta inusitada decisión de la mayoría también es contraria a conocidos principios sobre la naturaleza y el rol del proceso de

arbitraje en el campo de las relaciones obrero-patronales, por lo que debilita esa importante institución de nuestro ordenamiento jurídico.

Sabido es que el arbitraje es un medio eficaz y rápido de resolver las disputas obrero-patronales. Se trata propiamente de una extensión del propio proceso de la negociación colectiva, parte integral de un esquema fundamental que procura asegurar y mantener la paz industrial y evitar las huelgas. Por ello es que se estima imprescindible que los laudos arbitrales tengan la máxima finalidad posible. Se le reconoce la mayor deferencia a los laudos de los árbitros laborales con el fin de inmunizar las disputas obrero-patronales de los serios efectos adversos que tienen los gastos, el malestar y las demoras que el juicio y las apelaciones judiciales acarrean.

La conocida doctrina nuestra que limita estrictamente la revisión judicial de los laudos de arbitraje tiene una excepción cuando los laudos están sujetos al acuerdo de las partes de que dichos laudos han de ser *conforme a derecho*. Sin embargo, aun dichos laudos ameritan respeto y deferencia judicial, sobre todo cuando tratan de una cuestión de **arbitrabilidad procesal**. Ello es así no sólo por las consideraciones sistémicas aludidas antes, que son pertinentes aun en la instancia referida sino también por razón de la familiaridad del árbitro con las normas y prácticas aplicables. El árbitro frecuentemente tiene conocimiento del propio derecho laboral o una amplia experiencia con su aplicación y trasfondo. Está versado en los asuntos obrero patronales, en la naturaleza de las disputas que surgen en este campo y de los intereses en conflicto, y sabe de las reglas y estándares propios que prevalecen en la práctica cotidiana en este campo a fin de procurar la paz industrial. Su *expertise* es particularmente pertinente cuando se trata de interpretar la intención de las partes en un convenio colectivo sobre qué asuntos son arbitrables y cuales no. Por ello, aun cuando se haya pactado que se debe decidir conforme a derecho, su decisión sobre una cuestión de arbitrabilidad procesal, como la que aquí nos concierne, merece deferencia judicial, a menos que sea contraria a una disposición clara y terminante del convenio colectivo que de modo específico excluya la controversia substantiva del proceso de arbitraje; o a menos que la decisión del árbitro sobre la arbitrabilidad sea claramente contraria a normas o principios bien establecidos en el ordenamiento jurídico vigente.

En el caso de autos, la decisión del árbitro que la mayoría de este Tribunal revoca aquí era conforme a una anterior decisión nuestra. Además, dicho laudo arbitral es consistente con la postura sobre el asunto en cuestión sostenida por un número considerable de árbitros y otros especialistas en el campo laboral en los Estados Unidos, de donde se deriva nuestro derecho laboral. Ciertamente, no hay una disposición en el convenio colectivo en cuestión ni una norma o principio alguno en nuestro propio ordenamiento jurídico que sean contrarias a lo resuelto por el árbitro en el caso de autos. **Cuando menos**, pues, la decisión arbitral en cuestión es plausible, por lo que no hay justificación para revisarla como si se tratase de una sentencia de un tribunal inferior. Véase, D.M. Helfeld, La

_Jurisprudencia Creadora: Factor Determinante en el Desarrollo del Derecho de Arbitraje en Puerto Rico_, 70 Rev. Jur. UPR págs. 82-83 (2001).

En resumen, pues, la decisión del árbitro en el caso de autos fue esencialmente conforme a derecho. Merece nuestra deferencia, tal como lo determinó correctamente el foro apelativo. Como la mayoría de este Tribunal decide de otro modo, que es inconsistente con nuestra jurisprudencia y que atenta contra el rol vital que juega el arbitraje como medio eficaz para resolver disputas laborales, yo **disiento**.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO